IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY ___ D.C.

2005 SEP 10  PM 12: 41

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | |
|---|---|
| JOSEPH D. SMITH, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 03-2360 Ml/An |
| | ) |
| ROSENTHAL COLLINS GROUP, LLC | ) |
| MAUREEN C. DOWNS and | ) |
| DOUGLAS O. KITCHEN | ) |
| | ) |
|     Defendants. | ) |

---

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Before the Court is the Motion for Summary Judgment of Defendants Rosenthal Collins Group, LLC, Maureen C. Downs, and Douglas O. Kitchen, filed May 16, 2005.  Plaintiff responded in opposition on July 6, 2005.  For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

## I. BACKGROUND AND RELEVANT FACTS

The instant case arises out of the termination of Plaintiff Joseph D. Smith's employment as a futures commodities broker with Rosenthal Collins Group, LLC ("RCG") on July 27, 2001, and the subsequent termination of his business relationship with Rosenthal Collins Securities ("RCS").  Defendant Maureen C. Downs

-1-

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 9-12-05



was the Executive Vice President of RCG.  Defendant Douglas O. Kitchen was a Managing Director of RCG.

In September 1999, RCG hired Plaintiff and two other brokers, Charles Ross and Patrick McClatchy, to open a branch office in Memphis, Tennessee, to accommodate the futures business of the three brokers.  According to Plaintiff, he was diagnosed with bipolar disorder in late 2000.  Plaintiff took medication for his disorder, which caused him to be "sluggish" at times in the mornings, but otherwise did not affect his job performance. He claims that he disclosed his condition to the staff, branch manager, and Defendant Kitchen but assured them that it would not affect his job performance.  The record is unclear whether Defendant Kitchen agrees that he was informed about Plaintiff's condition, but Defendant Downs claims she was not made aware of this fact until Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") subsequent to his termination.

The parties do not dispute that at some point in July 2001, Plaintiff and Defendant Kitchen met and discussed Plaintiff's financial affairs and job performance.  Plaintiff contends that:

> In a surprise meeting instigated by Defendant
> Kitchen in early July 2001 in Nashville, Kitchen
> made several discouraging comments regarding my
> physical, mental, and emotional ability to
> handle my commodity futures trading business and
> take on the new enterprise of adding equity
> securities trading to my business.  Defendant
> Kitchen wanted me to quit taking my medications
> for the bipolar condition and to concentrate on

> my futures commission base.  He stated that he
> wanted the "old Joe" back.  I took that to mean
> the "manic Joe" who was not controlling his mood
> swings with medication.  Kitchen warned me that
> I was going to "hit the wall" or there would be
> an "explosion" and it would be me blowing up.
> At no time during this meeting did Kitchen
> indicate that I would be terminated from RCG for
> any of the reasons discussed during that meeting
> or for reasons given since my termination.

(Pl.'s Res. Opp. Defs.' Mot. Summ. J. at 7.)  According to

Plaintiff, Defendants Downs and Kitchen terminated his employment

with RCG shortly thereafter, on July 27, 2001, without proper

notice or cause.[1]  Defendants claim, however, that they met with

Plaintiff in an effort to get his performance at work "back on

track."  Both parties agree that Plaintiff had incurred a large

debt in his personal trading account, and Defendants assert that

they simply encouraged Plaintiff to stop trading in that account

and focus on his core commodities trading.

It is undisputed that not long after Plaintiff was

terminated, he was given an opportunity to return, on the

condition that he accept the terms set forth in Defendants'

"Five-Point Plan."  The plan required Plaintiff to stop trading

in his personal account, adhere to certain job performance

---

[1] Plaintiff alleges that initially, Defendants fired him without
explanation, saying simply that "it was just not working out."
(Compl. ¶ 24.)  Later, Plaintiff claims, he was informed that he was
terminated for "absenteeism which would always hold up in court."
(Pl.'s Res. Opp. Defs.' Mot. Summ. J. at 9.)  RCG filed a notice of
termination, or Form 8-T, with the National Futures Association on
August 13, 2001, which reported that Plaintiff was terminated on July
27, 2001.  The reason provided was "absenteeism during market hours."
(Pl.'s Res. Opp. Defs.' Mot. Summ. J., Downs Dep. Unnumbered Ex.)

requirements, and discontinue business with Jon Porter, with whom Plaintiff was planning to open a securities trading firm. Defendants claim that they were forced to terminate Plaintiff because he refused to accept the terms of their proposal. (Defs.' Mot. Summ. J. 12.)  According to Plaintiff, the proposal was unacceptable, as it would have foreclosed his future business opportunities with Mr. Porter, and he was already in compliance with its other demands.

Prior to his termination from employment with RCG, Plaintiff entered into negotiations with Rosenthal Collins Securities, LLC ("RCS"), an equity securities trading firm[2], to become a Registered Representative.  Plaintiff planned to trade equity securities products for RCS as a separate business alongside his futures trading business at RCG.  Plaintiff contends that he had entered into a verbal agreement with Jon Porter to join client bases and that RCS anticipated Porter and Plaintiff would generate a high volume of business.  Defendants admit they were aware of Plaintiff's negotiations but claim that Plaintiff never entered into a binding legal contract with RCS.

The parties do not dispute that RCS and Plaintiff terminated their relationship in August 2001.  Plaintiff contends that Defendants Downs and Kitchens effectuated this termination, but

---

[2] Although the parties agree that RCG and RCS share partial common ownership, they do not agree on the extent to which the two constitute separate entities.

Defendants deny that they were involved in the decision.

Plaintiff alleges he suffered financial and emotional damages following his termination from RCG and RCS, which included personal bankruptcy and time in a convalescent clinic. He filed a Charge of Discrimination against RCG with the EEOC on May 17, 2002, and filed the instant action against RCG, Downs, and Kitchen on May 20, 2003.  Plaintiff alleges that Defendants discriminated against him in violation of the Americans With Disabilities Act ("ADA") because Plaintiff was discharged as a result of Defendants' perception that Plaintiff was disabled.  He further alleges that RCG breached its contract with Plaintiff and tortiously interfered with Plaintiff's contract with RCS as well as his business relationship with RCS.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary

judgment is appropriate. Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## III. ANALYSIS

Defendants move the Court to find Plaintiff judicially estopped from bringing this action. They also move for summary judgment as to all of Plaintiff's claims. The Court will

consider Defendants' contentions in turn.

### A.   Judicial Estoppel

Defendants contend at the outset that Plaintiff is judicially estopped from bringing the instant action because he failed to disclose his cause of action as an asset of his bankruptcy estate.  Section 521(1) of the Bankruptcy Code requires a debtor to disclose all of his assets to the bankruptcy court. 11 U.S.C. § 521(1) ("The debtor shall file ... a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs."); Browning v. Levy, 283 F.3d 761, 775 (6th Cir. 2002). It is well settled that a cause of action is an asset that must be disclosed under § 521(1).  See, e.g., In re Coastal Plains, Inc., 179 F.3d 197, 207-8 (5th Cir. 1999) ("It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims."); Richardson v. United Parcel Service, 195 B.R. 737, 739 (E.D. Mo. 1996) ("Numerous courts ... have held that omission or nondisclosure of a cause of action as an asset in a bankruptcy schedule provides and appropriate basis for judicial estoppel.") The duty to disclose assets, such as a cause of action, is also "a continuing one." In re Coastal Plains, Inc., 179 F.3d at 208.

The doctrine of judicial estoppel bars a party from "(1)

-7-

asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" Browning, 283 F.3d at 775 (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)).  The doctrine is an equitable one and is "to be applied in a court's discretion," New Hampshire v. Maine, 532 U.S. 742, 749 (2001), so as to prevent a party from "abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." Teledyne Indus., Inc., 911 F.2d at 1218.

Plaintiff concedes his obligation under the Bankruptcy Code to disclose all potential claims and causes of action in his listing of bankruptcy assets.  He argues, however, that his failure to disclose his cause of action against Defendants was inadvertent.  The Sixth Circuit has adopted the analysis of the Fifth Circuit in In re Coastal Plains, Inc., 179 F.3d 197 (5th Cir. 1999), which defines two circumstances in which a debtor-plaintiff's failure to disclose a cause of action to the bankruptcy court may be considered "inadvertent."  Browning, 283 F.3d at 776.  The first circumstance is where "the debtor lacks knowledge of the factual basis of the undisclosed claims, and the other is where the debtor has no motive for concealment." Id. (citing In re Coastal Plains, Inc., 179 F.3d at 210).  Plaintiff contends that both circumstances apply here.

According to Plaintiff, he was "unable to fully determine if he had any viable claims against Rosenthal Collins Group" until after he filed his bankruptcy petition. (Pl.'s Resp. Mem. Opp. Defs.' Mot. Summ. J. at 3.)  In particular, Plaintiff contends he consulted two attorneys with regard to his potential claims against RCG prior to filing his bankruptcy petition. (Smith Aff. ¶ 1.)  The first attorney informed Plaintiff that he had no viable legal recourse, and the second—Plaintiff's current lawyer, Carolyn Howard, Esq.—told Plaintiff that the "only possible viable claim ... was a perceived disability claim under the ADA." (Id.)  At this meeting, which took place on October 31, 2001, Ms. Howard asked Plaintiff to "write out a detailed narrative with documentation" for her review.  Plaintiff did not retain Ms. Howard at the time.  (Id.; see also Howard Decl. ¶ 1.) Plaintiff filed for bankruptcy on March 13, 2002, at which time he informed his bankruptcy attorney that one attorney "indicated that [he] might have a claim of perceived disability against RCG." (Smith Decl. ¶ 2.)  In the filings submitted to the bankruptcy court, however, the claim was not listed.  (Id.)  On May 8, 2002, Plaintiff retained Ms. Howard for the purpose of analyzing his potential claims and to "take any necessary steps to preserve" his legal rights.  (Id.)  Upon determining that a claim should be filed, Ms. Howard filed a Charge of Discrimination with the Equal Employment Opportunity Commission on May 17, 2002.  (Howard Decl. ¶ 3.)

-9-

Plaintiff's uncertainty as to the legal basis for recourse against RCG at the time his bankruptcy petition was filed does not make his failure to disclose any potential claims "inadvertent" for the purposes of judicial estoppel.  A debtor "need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information ... prior to confirmation to suggest that it may have a possible cause of action," then the debtor has a "known" cause of action that must be disclosed.  In re Coastal Plains, Inc., 179 F.3d at 208 (citation omitted).  The record indicates that Plaintiff was well aware of the factual basis for a "possible" cause of action against RCG at the time he filed his petition.  Thus Plaintiff's failure to disclose his potential claims cannot be considered "inadvertent" under the first Coastal Plains factor.

The second circumstance in which a debtor's failure to disclose is considered an "inadvertent" omission is where the debtor has no motive for concealment.  In re Coastal Plains, Inc., 179 F.3d at 210.  Whether or not the debtor will receive a "windfall" as a result of his failure to disclose a cause of action is a significant factor in this inquiry into a debtor's motive.  See Browning, 283 F.3d at 776.  Defendants argue that Plaintiff "obviously had a motive for concealment" because by failing to disclose his claims against RCG, "Plaintiff was able to secure a discharge of his debts, while keeping the full benefit of any potential recovery on the employment

-10-

discrimination and other claims to himself." (Defs.' Mot. Summ. J. at 10.) Plaintiff, however, points to specific facts in the record that demonstrate that the bankruptcy trustee was, and is, well aware of Plaintiff's lawsuit, has reopened the bankruptcy case in light of Plaintiff's disclosure, and has withdrawn an earlier notice to the bankruptcy court that Plaintiff's estate had no assets to distribute in order to "further investigate a possible asset which could result in monies being realized by the estate." (Notice Withdrawing Report of No Distribution, Oct. 9, 2002; see also Howard Decl. ¶¶ 8-11.) Plaintiff also asserts that he made several good faith efforts to disclose his legal claims and to remedy his disclosure statement omission. See Eubanks v. CBSK Fin. Group, Inc., 385 F.3d 894, 895 (6th Cir. 2004) ("[T]his Court considers reasons of mistake and inadvertence, as well as an absence of good faith, in determining judicial estoppel ....") In particular, Plaintiff states that he (1) informed Steve Bilsky, Esq., his bankruptcy attorney, that he had sought legal advice regarding possible causes of action against RCG and that one attorney indicated that Plaintiff might have a viable legal claim; (2) advised Carolyn Howard, Esq., his attorney in the instant matter, of his pending bankruptcy petition when the EEOC charge was filed; (3) was under the impression that Ms. Howard called Mr. Bilsky and "asked him to amend the disclosure statement to include [Plaintiff's] possible claims[;]" (4) "was not advised when the bankruptcy estate was

-11-

discharged[;]" and (5) upon learning of the discharge, instructed
Ms. Howard to "get the estate reopened to include the potential
[claims] against RCG[.]" (Smith Decl. ¶¶ 2,4-5.)

The Declaration of Carolyn Howard, submitted in support of
Plaintiff's opposition to Defendants' motion for summary
judgment, confirms and elaborates on Plaintiff's efforts.  Ms.
Howard states that she (1) was informed by Plaintiff on May 8,
2002, that Plaintiff told his bankruptcy attorney of his
potential legal claims, although he did not include them in his
list of assets "since he did not know whether he had any claims
at the time he filed that statement[;]" (2) before filing
Plaintiff's Charge of Discrimination with the EEOC on May 17,
2002, "notified [Plaintiff's] bankruptcy attorney, Steve Bilsky,
by telephone, that an EEOC charge would be filed, and asked that
the potential claims be declared in the estate[;]" (3) asked Mr.
Bilsky how to "go about being hired by the bankruptcy court as
Plaintiff's counsel in order to proceed on [Plaintiff's]
claims[;]" and (4) contacted Plaintiff's bankruptcy trustee,
Richard Doughtie, on August 20, 2002, to discuss reopening the
estate.  (Howard Decl. ¶¶ 2,4,8.)   The record further indicates
that the bankruptcy trustee hired Ms. Howard to "act as the
special counsel in the matter of claims of Joseph Smith" against
RCG pursuant to an order of the United States Bankruptcy Court
for the Western District of Tennessee on November 22, 2002.
(Howard Decl. ¶ 9; Letter from Richard T. Doughtie, III, to

-12-

Carolyn Howard, Esq. of 11/22/02.)

On this record, the Court concludes that the failure to list Plaintiff's cause of action as an asset on his bankruptcy petition was inadvertent.  Under the second <u>Coastal Plains</u> circumstance, specifically, Plaintiff has sufficiently demonstrated that he had no <u>actual</u> motive to conceal and, in fact, took affirmative steps to disclose his claims in the bankruptcy proceeding.  Thus, the Court finds that this is not an appropriate case for judicial estoppel and declines to dismiss Plaintiff's claims on this theory.

### B.   Americans With Disability Act

Defendants then move for summary judgment on Plaintiff's claim of discrimination under the ADA.  A plaintiff may support a claim of discrimination under the ADA with either direct or circumstantial evidence of discrimination.  Where a plaintiff points to circumstantial evidence of discrimination, his claim is analyzed under the framework for deciding discrimination cases set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Kocsis v. Multi-Care Mgt.</u>, 97 F.3d 876, 882-83 (6th Cir. 1996) (citations omitted).

Under that framework, a plaintiff must first establish a <u>prima facie</u> case of disability discrimination by proving that: (1) he was "disabled" within the meaning of the Act; (2) he was qualified for the position; (3) he suffered an adverse employment

decision with regard to the position in question; and (4) a non-disabled person replaced him or was selected for the position that the disabled person had sought. Kocsis, 97 F.3d at 882-83 (citations omitted).  In order to prove that he is disabled under the ADA, a plaintiff must show that he (1) has a physical or mental impairment that substantially limits one of more of his major life activities; or (2) that he has a record of such an impairment; or (3) that he is regarded as having such an impairment.  See 42 U.S.C. § 12102(2).

Persons who have impairments that are not substantially limiting, but who are regarded by their employer as being substantially limited, are considered "disabled" for the purposes of the ADA.  Kocsis, 97 F.3d at 884.  "That definition of disability is designed to protect against erroneous stereotypes some employers hold regarding certain physical or mental impairments that are not substantially limiting in fact."  Id. at 885 (citation and internal quotation marks omitted).

If the plaintiff establishes the elements of a prima facie case of disability discrimination, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. Kocsis, 97 F.3d at 882-83 (citation omitted).  If the defendant carries that burden of production, then the plaintiff must then prove that the defendant's proffered reasons were not its true

-14-

reasons, but were merely a pretext for illegal discrimination. _Id._ (citation omitted).

In order to show that the defendant's reasons were pretextual, a plaintiff must prove: (1) that the proffered reasons had no basis in fact; or (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. _Id._ (citations omitted).  At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place.  _Id._ (citation omitted).

### 1. **Prima Facie** Case

To establish a _prima facie_ case that he was regarded as disabled under the _McDonnell Douglas_ burden shifting scheme, a plaintiff must show that the defendants treated him as having an impairment that substantially limits one or more of his major life activities, that he is otherwise qualified for the position for which he applied, and that he was denied employment because the defendant regarded him as disabled.  _Sullivan v. River Valley School Dist._, 197 F.3d 804, 810 (6th Cir. 1999).

Defendants contend that Plaintiff cannot make this showing. They argue first that Plaintiff cannot prove that Defendants treated him as having an impairment that substantially limited one or more of Plaintiff's major life activities.  There are two ways by which individuals may be regarded by a covered entity as

-15-

being disabled for purposes of the ADA: a mistaken belief that a person has a physical impairment that substantially limits one or more major life activities, or a mistaken belief that an actual, nonlimiting impairment substantially limits one or more major life activities.  Cotter v. Ajilon Servs., 287 F.3d 593, 599 (6th Cir. 2002)(citing Sutton v. United Air Lines, 527 U.S. 471, 489 (1999)); Equal Employment Opportunity Comm'n v. Northwest Airlines, Inc., 246 F.Supp.2d 916, 924 (W.D. Tenn. 2002).

     A plaintiff must show that any perceived impairment is regarded by the employer as a substantial limitation on a major life activity.  Kocsis, 97 F.3d at 885 (citations omitted).[3] Plaintiff contends that Defendants regarded him as substantially limited in the major life activities of cognitive thinking and coping with multiple tasks.  (Pl. Resp. Defs.' Mot. Summ. J. at 7.)  Thinking has been held to be a major life activity under ADA regulations, Salim v. MGM Grand Detroit, L.L.C., 106 Fed. Appx. 454, 459 (6th Cir. 2004) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999)), but the Court finds no

---

[3] Regarding major life activities other than working, an individual is "substantially limited" when he is:
> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

-16-

authority to support Plaintiff's contention that "coping with multiple tasks" is a major life activity under the ADA.

The Court finds that Plaintiff has pointed to sufficient evidence in the record to create genuine issues of material fact as to whether Defendants regarded Plaintiff as substantially limited as to the major life activity of thinking. Specifically, Plaintiff points to evidence that upon learning of his bipolar diagnosis, he disclosed this information to his office partners, staff, branch manager, and Defendant Kitchen—who subsequently made disparaging remarks about Plaintiff's job performance abilities. (Smith Decl. ¶¶ 22,24.) Specifically, Kitchen told Plaintiff that Plaintiff was physically, mentally and emotionally unable to handle his duties at RCG and that Kitchen "wanted [Plaintiff] to quit taking ... medications for the bipolar condition." (Smith Decl. ¶ 24.) According to Plaintiff, Kitchen also stated that he wanted "the 'old Joe' back" which Plaintiff took to mean "the 'manic Joe' who was not controlling his mood swings with medication." (Id.) Assuming these facts to be true, the Court finds that genuine issues of material fact exists as to whether Defendants treated Plaintiff as having an impairment that substantially limited a major life activity.

The parties also dispute whether Plaintiff was otherwise qualified for his position at RCG. Defendants argue that due to erratic work attendance, unsatisfactory performance, and unsound

decisions, Plaintiff was unfit for his responsibilities as a broker at RCG. However, Plaintiff points to evidence in the record that he was in the office over forty hours per week and that his attendance record was superior to that of other brokers. Plaintiff also points to evidence that he received no customer complaints during his tenure at RCG and that his share of RCG's earnings was on par with or exceeded that of other brokers in the office. Finally, Plaintiff concedes that he suffered losses in his personal commodity futures account, but that after discussing the matter with Defendant Kitchen, he ceased trading in that account. (Smith Decl. ¶¶ 6,7,26,28.) On the record before the Court, it is apparent that a material issue of fact exists as to whether Plaintiff was qualified for the position from which he was terminated.

Finally, Defendants contend that Plaintiff was terminated because of poor work performance and not because he was perceived as disabled. As set forth above, Plaintiff has set out sufficient evidence in the record to create a genuine issue of material fact as to the reason for Plaintiff's termination. Accordingly, viewing the evidence in the light most favorable to the nonmovant, the Court concludes that Plaintiff has established a prima facie case that he was discriminated against because Defendants regarded him as disabled.

## 2.  Legitimate Nondiscriminatory Reason

Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff from employment at RCG.  Namely, they contend that Plaintiff was not "servicing his existing clients[,]" making sound judgments with respect to his personal trading account, coming to the office during market hours, or concentrating on his primary job responsibilities.  Defendants also point to Plaintiff's refusal to accept certain conditions of continued employment contained in their "Five-Point Plan." (Defs.' Mot. Summ. J. at 13-14.)  However, as noted above, Plaintiff has put forward evidence in the record that he performed all of his job responsibilities on par with or better than other brokers in the office.  In addition, Plaintiff points to RCG's response to the EEOC's Request for Information, submitted on October 31, 2002, in which it "admits that Claimant [Plaintiff] did not incur any customer complaints ...." (Letter from John J. Muldoon, Counsel for RCG, to Earl Everett, Investigator, EEOC, of 10/31/02, at FOIA 00003.)  This evidence, if proven true, would support Plaintiff's contention that Defendants' reasons for termination were a pretext for discrimination.  Again, Plaintiff has submitted sufficient evidence, when viewed in the light most favorable to the nonmoving party, to create genuine issues of material fact as to whether Defendants had a legitimate, nondiscriminatory reason for

terminating Plaintiff's employment, and whether that reason was a pretext for discrimination.  Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's claim under the ADA.

### C.   Breach of Contract

Defendants next argue that they are entitled to summary judgment on Plaintiff's breach of contract claims.  Plaintiff contends that Defendant RCG breached its contract with Plaintiff by terminating Plaintiff's employment without 120 days' notice, as specified in the parties' written agreement.[4]  Defendants, however, claim that although the term "cause" is not defined in the agreement, Plaintiff's "chronic absenteeism, recklessness with financial accounts and a refusal to service clients in a manner acceptable to the employer" qualify as cause under any definition. (Defs.' Mot. Summ. J. at 15.)

The parties agree that the employment contract between Plaintiff and RCG does not define "good cause."  In Tennessee, "every contract contains an implied duty of good faith and fair dealing in its performance and enforcement." TSC Industries, Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. App. 1987).  In

---

[4] The Branch Office Agreement between RCG, Charles Ross, Joseph Smith and Patrick McClartchy provides: "Either party may terminate this agreement with 120 days notice.  If RCG terminates its relationship with Broker(s) for cause, no notice period will be required.  In the event of termination, the parties will cooperate to wind-up the affairs in a fair and orderly manner. RCG agrees to reassign the accounts of Brokers to a clearing firm of their choice."  (Complaint Ex. C ¶ 20.)

addition, every party to a contract impliedly promises "that he will not intentionally or purposely do anything ... which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Winfree v. Educators Credit Union</u>, 900 S.W.2d 285, 289 (Tenn. App. 1995) (quoting 17 Am.Jur.2d Contracts § 256 (1964)).  The Tennessee Court of Appeals recently examined various court decisions construing the scope of "termination for cause" and similar terms in the private employment context and concluded that "[w]hether good cause exists to terminate an employment contract is a determination made on a case-by-case basis, and exists where the discharge is 'objectively reasonable.'" <u>Lawrence v. Rawlins</u>, No. M1997-00223-COA-R3-CV, 2001 WL 76266, at *4 (Tenn. Ct. App. Jan. 30, 2001) (citing <u>Video Catalog Channel, Inc. v. Blackwelder</u>, No. 03A01-9705-CH-00155, 1997 WL 581120, at *3 (Tenn. Ct. App. Sept. 19, 1997)).  The court concluded that "an employee has been terminated for cause if the employee's termination stems from a job-related ground, [which] includes any act that is inconsistent with the continued existence of the employer-employee relationship." <u>Id.</u> (citations omitted).

Having reviewed the record and the parties' submissions, the Court finds that Plaintiff has pointed to sufficient evidence in the record to create a genuine issue of material fact as to whether Plaintiff's employment was terminated for "good cause" as

that term is construed under Tennessee law. As set forth above, Plaintiff points to evidence in the record that he was in the office over forty hours per week, that his attendance record was superior to that of other brokers, that he received no customer complaints during his tenure at RCG, and that his share of RCG's earnings was on par or exceeded that of other brokers in the office. Plaintiff acknowledges that he suffered losses in his personal commodity futures account but that after discussing the matter with Defendant Kitchen, ceased trading in that account prior to his termination. (Smith Decl. ¶¶ 6,7,26,28.) Plaintiff also points to Defendant Kitchen's testimony that Kitchen did not "recall a customer account of [Plaintiff's] that went deficit [sic] and didn't pay," (Kitchen Dep. at 104) as well as the deposition testimony of brokers Ross and McClatchy, who each stated that they had let margin calls go uncovered for a period of several days (See Ross Dep. at 41-42; McClatchy Dep. at 47-48).

Drawing all inferences in Plaintiff's favor, the Court concludes that there is a genuine issue for trial as to whether Plaintiff was dismissed summarily without cause, in violation of the 120-day notice requirement. Accordingly, the Court DENIES Defendants' motion for summary judgment on this claim.[5]

---

[5] Defendants also contest Plaintiff's other breach of contract claims, in particular the claim that RCG improperly withheld money from Plaintiff's escrow account. Upon reviewing Plaintiff's submissions, along with the entire record in this case, the Court

-22-

**D.  Statutory Procurement of Breach of Contract and Tortious Interference with Contract**

Defendants also move for summary judgment on Plaintiff's claims of statutory procurement of breach of contract under Tenn. Code Ann. § 47-50-109 and common law tortious interference with contract.[6]  Defendants argue that Plaintiff did not have a valid contract with RCS and thus, Plaintiff cannot make out a prima facie case on either claim.

In order to recover for procurement of a breach of contract——either statutory or at common law——a plaintiff must prove that "there was a legal contract for a designated term, the tortfeasor was aware of the contract, the tortfeasor maliciously intended to induce a breach of the contract, there was a breach proximately caused by the tortfeasor's acts, and the plaintiff was damaged as the result of the breach." Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994).  Under Tennessee law, "unless there is a contract of employment for a definite term, a discharged employee may not recover against an employer for breach of contract because there is no contractual right to continued employment."  Id.; see also Winfree v. Educators Credit

---

finds there remain a genuine issue of material fact regarding these claims.  Accordingly, Defendants' motion is DENIED.

[6] The Court notes that in his pleadings, Plaintiff does not assert a claim for intentional interference with at-will employment by a third party without privilege or justification.  See Nelson v. Martin, 1996 WL 47137, at *3 (Tenn. App. Feb. 1, 1996); Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994).

<u>Union</u>, 900 S.W.2d 285, 290 (Tenn. Ct. App. 1995); <u>Smith v. Harriman Utility Bd.</u>, 26 S.W.2d 879, 885 (Tenn. Ct. App. 2000). Plaintiff admits that he was an at-will employee of RCS; in fact he states that "there can be no dispute that there was a verbal employment contract terminal at will" between Plaintiff and RCS. (Pl.'s Res. Opp. Defs.' Mot. Summ. J. at 16.)   Plaintiff's "Independent Contractor's Agreement" with RCS states "[t]his Agreement shall continue in force unless terminated as set forth below" and provides that termination may be with or without cause.  (Compl. Ex. D.)  As an at-will employee, Plaintiff "had no contractual right to continued employment."  <u>Wooley v. Madison County</u>, 209 F. Supp. 2d 836, 847 (W.D. Tenn. 2002) (citing <u>Forrester</u>, 869 S.W.2d at 330)).  As Plaintiff had no contractual right to continued employment with RCS, Defendants cannot be held liable for breach of contract.  <u>See</u> <u>Winfree</u>, 900 S.W.2d at 290 ("A fundamental requirement in sustaining an action for procurement of the breach of a contract is an actual breach.") Accordingly, Defendants' motion for summary judgment on the claims of statutory and common law procurement of breach of contract is GRANTED.

### E.   **Tortious Interference with a Business Relationship**

Finally, Defendants move for summary judgment on Plaintiff's claim that Defendants tortiously interfered with Plaintiff's business relationship with Rosenthal Collins Securities.

-24-

Liability may be imposed for intentional interference with business relationships where the plaintiff can demonstrate: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002).

Defendants' primary contention is that they cannot be held liable for tortious interference with Plaintiff's business relationship with RCS because RCG and RCS are "sister companies, or affiliates, and share common ownership." (Defs.' Mot. Summ. J. at 18.)  However, Plaintiff has pointed to evidence in the record that RCG and RCS are legally separate entities that do not share a common interest or unity of purpose.  In particular, RCG's October 31, 2002, response to the EEOC's Request for Information pursuant to Plaintiff's EEOC complaint states that "RCG also affirmatively states that RCS is a separate business entity from RCG albeit with some common ownership to [sic] RCG." (Letter from John J. Muldoon, Counsel for RCG, to Earl Everett, Investigator, EEOC, of 10/31/02, at FOIA 00003.)  Plaintiff has

-25-

also set forth sufficient facts to create genuine issues of fact as to the other elements of a _prima facie_ case of tortious interference with a business relationship.  Accordingly, the Court DENIES Defendants' motion for summary judgment on this claim.

## IV. CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's claim of statutory procurement of breach of contract and common law tortious interference with contract.  The Court DENIES Defendants' motion for summary judgment as to Plaintiff's claim of discrimination under the ADA, breach of contract and tortious interference with a business relationship.  Finally, the Court declines to dismiss Plaintiff's claims on the theory of judicial estoppel.

So ORDERED this _10_ day of September, 2005.

JON P. McCALLA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 100 in case 2:03-CV-02360 was distributed by fax, mail, or direct printing on September 12, 2005 to the parties listed.

---

Carolyn Howard
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Melissa Kimberly Hodges
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Thomas L. Henderson
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Jeffery Atchley
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Honorable Jon McCalla
US DISTRICT COURT