**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

FILED IN OPEN COURT
DATE: 9/19/05
TIME: 9:40 Am
INITIALS: JPW

JOSEPH D. SMITH,                  )
                                 )
        Plaintiff,               )
                                 )
    v.                           )       No.    03-2360 MI/A
                                 )
ROSENTHAL COLLINS GROUP, LLC,    )
MAUREEN C. DOWNS, and            )
DOUGLAS O. KITCHEN,              )
                                 )
        Defendants.              )

---

## ~~PROPOSED~~ JOINT PRETRIAL ORDER

---

The parties, through counsel, file this Proposed Pretrial Order. In preparation for

the pretrial conference to be held in this case on September 19, 2005, at 8:45 a.m., before

the Honorable Jon Phipps McCalla, Judge of the United States District Court, the parties

submit the following as items to be included in the final Pretrial Order.

### JURISDICTION

Jurisdiction has been conceded by the parties and should be found by the Court to

be present pursuant to 28 U.S.C. §§ 1331, 1337, 1343, and 1367. Plaintiff contends that

supplemental jurisdiction is proper under 28 U.S.C. § 1367 for his common law state claims

of breach of contract and tortious interference with a business relationship. This is an

action specifically authorized and instituted pursuant to Section 102 of the Civil Rights Act

of 1991, 42 U.S.C. § 1981a, and Section 107(a) of the Americans with Disabilities Act of

1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., particularly, § 12117(a), which incorporates by

reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"),

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on  9-19-05



42 U.S.C. §§ 2000e-5(f)(1) and (3).

## ISSUES AS TO APPROPRIATENESS OF PARTIES

Defendants Rosenthal Collins Group, LLC, Maureen Downs, and Douglas Kitchen filed a Motion for Summary Judgment seeking dismissal of the entire case against all or some of the defendants.  The Court ruled on that motion on September 10, 2005. Defendants contend that Defendants Downs and Kitchen are no longer proper parties.

## MOTIONS PENDING

Defendants intend to file a motion *in limine* which will be pending at the time of the pretrial conference. Additionally, Defendants' Unopposed Motion for Clarification or, in the Alternative, Defendants' Motion for Reconsideration is currently pending before the Court. Defendants also filed an Unopposed Motion to Continue the Trial Date which is currently pending.

## DISCOVERY STATUS

All discovery has been completed.

## SETTLEMENT NEGOTIATIONS

A mediation was held before this case was filed in the district court and another mediation was held subsequent to its filing on September 14, 2004.  Both mediation attempts were unsuccessful.

## CONTENTIONS OF PLAINTIFF

This is an action brought by Plaintiff Joseph D. Smith against Defendants Rosenthal Collins Group, LLC ["RCG"], Maureen Downs, and Douglas Kitchen for discrimination based on a perceived disability, pursuant to the Americans with Disabilities Act of 1990

2

["ADA"], 42 U.S.C. §§ 12101 et seq., particularly, § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(1) and (3). Plaintiff Smith contends that he was involuntarily terminated from his position as a futures broker with RCG because Defendants perceived him to be disabled with bipolar disorder. Plaintiff contends that he was not disabled at any time prior to his discharge nor has he been disabled since his discharge from RCG.

Plaintiff Smith also seeks relief for Defendants' breach of his employment contract and for common law interference with a business relationship which he had established with Rosenthal Collins Securities, LLC. These state law claims are brought as supplemental claims pursuant to 28 U.S.C. § 1367.

## Facts and Contentions Pertaining to all Claims

From about February 1995 until October 1999, Plaintiff Smith was employed as a broker for J. C. Bradford & Co. in its Memphis office, holding Series 3 and 7 licences to sell, trade, and market equity securities and commodity futures contracts, as well as insurance and annuities. When J. C. Bradford shut down its commodity futures business in Memphis prior to a sale to Paine Webber, Plaintiff Smith and other futures brokers were laid off. Defendant Kitchen was also terminated at that time. Bradford/Paine Webber retained all securities accounts, but allowed futures accounts to be moved with the laid-off futures brokers, some of whom joined RCG. Following their lay-off, in October 1999, Plaintiff Smith, along with the two other former J. C. Bradford brokers, Charles Ross, and Patrick McClatchy, entered into a Branch Office Agreement with Defendant RCG, who had also hired Defendant Kitchen.

The Branch Office Agreement required RCG to open a branch office in Memphis to accommodate the commodities futures business of the three brokers, all of whom, under the Agreement, became registered Associate Persons and employees of RCG, along with their office staff, who also became RCG employees. The three brokers were equal partners who signed and were the responsible parties on a lease for office space to house their futures' business and RCG's branch office. They also jointly owned all office furniture and equipment, such as the telephone equipment and facsimile machine, office supplies, leaseholds, etc. and were jointly responsible and liable for paying all office expenses and depositing funds with RCG to pay the branch manager and administrative staff salaries out of their commissions earned selling futures.

In late 2000 and during early 2001, Plaintiff Smith was told by his physicians that he had bipolar disorder, commonly known as manic depression, a chemical imbalance in the brain causing mood swings, alternating bouts of depression and hyperactivity, and sometimes an inability to perform day-to-day activities. Plaintiff Smith was prescribed several different kinds of medication in an attempt to regulate and manage his symptoms. His medications, which he took daily, caused sluggishness and a low ebb of energy in the mornings; however, he was able to reach peak performance level in the afternoons and at night.

Following an MMPI test in December 2000 confirming the bipolar diagnosis, Plaintiff Smith advised his office partners, staff, Branch Manager, Jackie Russell, and RCG Managing Director Defendant Kitchen of his condition and that his disorder would not interfere with his ability to perform his job duties. Plaintiff Smith's disorder did not interfere

4

with his job duties and through July 2001 his employment was uneventful and free of disciplinary problems, complaints or reprimands. His sales record of futures contracts was high, being higher than at least one other broker in the Memphis office. Although he was sluggish at times in the mornings, Plaintiff was able to deal with clients, handle their orders, enter those orders, research the market, and conduct all necessary business from his home office computer with internet access when necessary. Also, while traveling on business or with his family, he was in constant contact with his office and/or clients when necessary. He had no customer complaints, either before or following his diagnosis, although other Memphis brokers did have customer complaints.

Provision 20 of the Branch Office Agreement states, in part: *"Either party may terminate this agreement with 120 days notice. If RCG terminates its relationship with Broker(s) for cause, no notice period will be required."* All terms of the Branch Office Agreement, including the notice provision, were conceived and drafted by RCG and the term "for cause" was not defined within the Agreement.

In a surprise meeting between Plaintiff and Kitchen, instigated by Defendant Kitchen in early July 2001 in Jackson, Kitchen made several discouraging comments regarding Plaintiff Smith's physical, mental, and emotional ability to handle his commodity futures trading business and resume trading in equity securities as he had done at J.C. Bradford. Defendant Kitchen wanted him quit taking the medications for his bipolar condition and to concentrate on his futures commission base.

On July 27, 2001, Defendants Downs and Kitchen verbally terminated Plaintiff Smith from RCG's employ without stating any cause or giving any legitimate articulated reason

5

and without giving him the 120 days notice as required by the Branch Office Agreement. Their only statement was *"it was just not working out."* This termination without sufficient notice resulted in Plaintiff Smith's futures and options broker's Series 3 license being placed in a dormant state (the first break in his license since his start-up in May 1980) and his being unable to trade in that business and earn income because RCG retained all of his account files. Further, on July 27, 2001, by overnight letter, RCG notified Plaintiff Smith's clients that he was no longer with RCG, referring them to a compliance officer to answer any of their questions and to other brokers to handle their business. After that date, the staff at RCG refused to give Plaintiff Smith telephone calls from his clients and/or prospective employers despite the fact he jointly owned the telephone system and was responsible for paying one/third of the telephone bill. The denial of access to his clients allowed the remaining two brokers, Ross and McClatchy, an opportunity to build relationships with all of Plaintiff Smith's clients. Plaintiff Smith avers that this action resulted in permanent irreparable damage to Plaintiff Smith's business.

Prior to his termination, Plaintiff Smith had performed his duties and responsibilities under the Branch Office Agreement for nearly two years, achieving high sales production, having no breaches of the contract on his part, without receiving any client complaints, and without RCG disciplining him in any manner.

Earlier in 2001, RCG had violated their own company policy when it accepted a $30,000 third-party check from a client instead of requiring Plaintiff's client, Jon Porter, to obtain a cashier's check for the $20,000-plus amount in question, which was the standard procedure and which Porter's father had previously done. Porter offered and was willing

6

to obtain a cashier's check and Plaintiff Smith was strongly recommending that action. RCG, however, accepted and deposited the third-party check in its bank to cover Porter's account deficit.   When there was an erroneous police report that the third-party check had been stolen, RCG panicked, sent the money back to the third-party's bank, and took over $20,000 from Plaintiff Smith's escrow account.   Following his termination, Plaintiff was unable to recover from either RCG or Porter any of the $20,000-plus wrongly taken from his escrow account by RCG.

In early 2001, Plaintiff Smith had begun the process of reactivating his equity securities Series 7 broker's license, which had been inactive since his leaving J. C. Bradford.   He did this in order to have the ability to trade equity securities products, manage money, and render advice on stock investments in addition to his commodity futures trading activities.   His Series 7 licence was originally registered in 1981, and over the years Plaintiff Smith had developed many contacts.   He began negotiations to become a Registered Representative with Rosenthal Collins Securities, LLC ["RCS"], a member of the National Association of Securities Dealers ["NASD"] and an equity securities trading firm.   RCS was a separate business entity from RCG and was owned by a holding company, Rosenthal Collins Holding, LLC.   There were some stock holders of RCG who also owned shares in the holding company.   RCG and RCS admit that these two companies are separate entities.

In preparation to trade equity securities products, such as stocks, bonds,  mutual funds, annuities, managed funds, and other products in addition to his commodity futures and options trading, Plaintiff Smith expended large sums of money, time, and energy in

marketing, licensing, and registration efforts to set up his securities business. Plaintiff Smith entered into a partnership with another broker, Jon Porter, whereby their joint efforts, along with those of a marketing consultant, would result in a strong broad-based referral source of more than 50 clients per month, a 200-plus existing client base of Jon Porter's from which to obtain securities clients and sales as well as from those of Plaintiff Smith's. The prospective partnership of Smith and Porter also had a verbal commitment of an immediate transfer of over $100 million in managed assets and mutual funds. These two brokers had the contacts, clean successful track records, and the commitment to succeed. It was anticipated that Plaintiff Smith would earn well over his average yearly income of $354,658 which he had earned when he previously sold both securities and futures in 1995, 1996 and 1997. In contemplating the volume of business that would be generated by his and Jon Porter's efforts, Rosenthal Collins Securities had urged Plaintiff Smith to recruit and hire additional junior brokers.

These ambitious acts by Plaintiff Smith were in response to RCG's encouragement to all its Memphis brokers in January 2001 to *"think outside the box"*, come up with ways to increase their money-earning potential, and try new things. Pat McClatchey, a RCG broker in the Memphis branch office, had previously set up a separate business enterprise which he was operating along with his futures trading business. Following Plaintiff's termination, the other Memphis broker in the RCG branch office, Charles Ross, went on to do the same.

Principals at Rosenthal Collins Securities had verbally approved the partnership and marketing arrangement planned by Plaintiff Smith, had expressed enthusiasm for the

anticipated business that would be cleared through their trading firm, had placed Plaintiff's Series 7 registration with NASD, had set up Plaintiff's internet access to MAXXbroker (to allow on-line trading), had forwarded all broker manuals, forms, guidelines, commission schedules, and operational policies to Plaintiff, and also had referred two other prospective brokers to possibly come into Plaintiff's firm with him.  It was anticipated that the Plaintiff Smith's Memphis office of Rosenthal Collins Securities would more than double RCS's current annual business in the first year.  Feelers were even tendered from Rosenthal Collins Securities to see if Plaintiff Smith and/or his partner would be interested in buying out entire operating company of Rosenthal Collins Securities.

On May 14, 2001, Rosenthal Collins Securities' Senior Vice President Dennis Nolte extended to Plaintiff Smith a Letter of Intent embodying an agreement of affiliation regarding fees and commissions which would enable Plaintiff Smith to operate a securities business from his current office.  Plaintiff Smith signed and returned the Letter of Intent to Rosenthal Collins Securities.  Also on May 14, 2001, Rosenthal Collins Securities tendered an Independent Contractor's Agreement which included a Securities and Exchange Commission U-4 application and contract, all of which Plaintiff Smith completed, signed, and returned to Rosenthal Collins Securities on May 24, 2001, thus accepting their offer to become a Registered Representative. Dennis Nolte, Vice President of Rosenthal Collins Securities, advised Plaintiff Smith that all paperwork was to be fully approved, signed, and filed, and that his business could began trading securities immediately after Labor Day 2001 when Jon Porter had planned to resign his then current position and come into partnership with Plaintiff.

9

Defendant Kitchen was kept fully informed by Plaintiff Smith and Rosenthal Collins Securities during early 2001 regarding the on-going negotiations and compliance processing with Dennis Nolte and what steps had been taken with Jon Porter and other persons to enable Plaintiff Smith reentry into the securities business as an affiliated Registered Representative of Rosenthal Collins Securities. Defendant Kitchen, not being a National Association of Securities Dealers registered securities broker, would not have had any supervisory authority over Plaintiff Smith's securities business activities.

On August 13, 2001, RCG filed a Form 8-T (Notice of Termination of Associated Person) with the Commodity Futures Trading Commission and the National Futures Association showing that Plaintiff Smith had been discharged from RCG on July 27, 2001. The Form 8-T indicated the reason for Plaintiff Smith's discharge was *"Absenteeism during market hours."* At no time prior to receipt of this Form 8-T had Plaintiff Smith been advised that he was being disciplined and/or terminated for absenteeism.

Although Dennis Nolte of Rosenthal Collins Securities had guaranteed Plaintiff Smith that his employment and their business affiliation was not going to be affected by his discharge from RCG, in early August 2001, Nolte verbally informed Plaintiff Smith that the Letter of Intent and the Independant Contractor's Agreement was being dissolved and he was being administratively discharged from Rosental Collins Securities, allegedly for lack of production which had never been previously discussed with Plaintiff Smith. At that time, Jon Porter's completed registration papers were due to be filed the Friday before Labor Day coinciding with his resignation from his current job. Thus, the business relationship that had formed between Rosental Collins Securities and Jon Porter was also terminated.

10

Nolte informed Plaintiff Smith that the *"powers that be at RCG"* were forcing Rosenthal Collins Securities to terminate their business dealings with Plaintiff Smith and his partner. Upon information and belief, those *"powers that be at RCG"* were Defendants Down and Kitchen. It has been admitted that Michael Downs, Chief Executive Office of RCG, was involved in the decision to terminate Plaintiff's relationship with RCS. These persons are not directly affiliated with Rosenthal Collins Securities, except as possible shareholders of Rosenthal Collins Holding, LLC which owned 99% of RCS.

Plaintiff Smith contends that RCG terminated his employment and interfered with the business relationship he had with Rosenthal Collins Securities because it perceived Plaintiff to be disabled and unable to perform his job duties due to his bipolar disorder which was, and is, controlled by medication. Plaintiff Smith further contends that Defendants had improper motives and/or used improper means to bring about the termination of his contract and business relationship with Rosenthal Collins Securities.

The discharge from RCG in violation of the ADA and without sufficient notice and the interference with the business relationship he had with Rosenthal Collins Securities so severely damaged Plaintiff Smith that he became distraught over his financial situation and suffered an emotional breakdown to the effect that he had to enter a convalescent clinic for a period of time in October 2001.

Plaintiff Smith suffered lost futures trading income which would have come from sales to almost 200 accounts that were retained by RCG. This action by RCG ruined his relationship with many of these clients, some of whom he had serviced since before his tenure at J. C. Bradford, and cost those clients investment earnings. The lost opportunities

11

and the ability to trade in either the futures or equities markets caused such a substantial downturn in Plaintiff Smith's ability to pay his current expenses that he was forced to declare personal bankruptcy under Chapter 7 to gain protection from his creditors.   The fact of these discharges and his bankruptcy will be on his permanent record for the rest of his trading career and will severely hamper his ability to reactivate his Series 7 equities license and obtain a job with a quality brokerage firm.   This damage to his business reputation is irreparable inasmuch as his lapse in registration and credit history will always have to be disclosed to various commissions and associations governing the equity and commodity futures markets and businesses, as well as disclosed to present and future clients. Plaintiff Smith has also suffered loss of out-of-pocket expenses connected with his efforts to establish and set up his securities business with Rosenthal Collins Securities of well over $34,000.00.

As a result of the termination of his affiliation with Rosenthal Collins Securities, he also suffered the loss of a potentially lucrative business association with two colleagues within the securities market place and the loss of potential commodity futures trades with the securities clients who were lost with his two colleagues.   Plaintiff Smith suffered emotional distress and mental anguish due to Defendants' interference with his business relationship with Rosenthal Collins Securities, a relationship that now will be lost to him forever.    Because of being forced to terminate their business relationship with Plaintiff Smith, Rosenthal Collins Securities itself suffered loss of substantial future economic earnings anticipated from its affiliation with Plaintiff Smith's business and has subsequently been closed down by the holding company.

## Contentions Pertaining to Disability Discrimination

Plaintiff Smith advised RCG management of his bipolar disorder which did not impair his ability to perform his duties and responsibilities as an employee of RCG. Plaintiff Smith contends that RCG perceived Plaintiff Smith to be unable to perform his job duties due to his bipolar disorder and that RCG discharged Plaintiff Smith based on its perception that he would be unable to continue to perform his job duties. As a result of this discharge, Plaintiff Smith contends that he has suffered lost of income, and the ability to earn future income, as well as suffered emotional distress, mental anguish, loss of self esteem, and damage to his business reputation and family relationship. Plaintiff Smith estimates he is entitled to $398,834 in lost wages since the date of his termination. He is also seeking seven years of front pay in an amount of $670,041 and $300,000 in compensatory and/or punitive damages on his ADA claim.

## Contentions Pertaining to Breach of Employment Contract

The Branch Office Agreement was a binding written contract with RCG. Plaintiff contends that Defendant RCG breached that express contract with Plaintiff Smith when RCG terminated Plaintiff without cause and without giving him the 120 days notice as required by the Branch Office Agreement. Plaintiff Smith also alleges other contract breaches, such as, withholding more than $20,000 for an error committed by RCG, making unwarranted threats toward Plaintiff regarding inducing the permanent cancellation of his Series 3 futures licence through Defendant Kitchen's influential position on the National Futures Association's Board of Directors, interfering with business relationships by telling

13

his clients he was not in the office, as well as taking possession of his telephone equipment and telephone number which he jointly owned with his partners.

The discharge from RCG without sufficient notice severely damaged Plaintiff Smith inasmuch as the loss of income, which came from over 200 accounts being retained by RCG, and the loss of the ability to trade in either the futures or equities markets caused such a substantial downturn in his ability to pay his current expenses that he was forced to declare personal bankruptcy under Chapter 7 to gain protection from his creditors. Plaintiff Smith has conservatively estimated that he will suffer loss of income from the date of his discharge through the date of trial of $398,834, plus at least seventeen years of additional economic costs of $714,000 and the $21,243 wrongfully withheld from his escrow account due to RCG wrongfully accepting Jon Porter's third-party check for a total of $1,134,077 on his breach of contract claim.

## Contentions Pertaining to Tortious Interference with a Business Relationship

Plaintiff Smith had accepted, signed, and returned offers of employment submitted by Rosenthal Collins Securities. On June 22, 2001, he became fully registered with the NASD with RCS holding his Series 7 license. Thus, there was an existing business relationship with RCS. Defendants Downs, and Kitchen had knowledge of the existence of that business relationship and Defendant RCG had construction knowledge through its CEO Michael Downs and other managers and agents, such as, Defendants Downs and Kitchen. Defendants intended bring about the termination of that business relationship that Plaintiff had with Rosenthal Collins Securities or were substantially certain that their actions would bring about a breach. Defendants acted maliciously, for an improper

purpose, without just cause, and/or in violation of the ADA in procuring the termination of that business relationship that Plaintiff had with Rosenthal Collins Securities. Rosenthal Collins Securities terminated the business relationship it had with Plaintiff by an administrative discharge and closure. The actions of Defendants were the legal cause of the breach and termination of that business relationship that Plaintiff had with Rosenthal Collins Securities, who would not have breached those contracts and terminated Plaintiff Smith without the wrongful acts, aid, and solicitation of Defendants.

Further, Defendants had no legal justification, reason, and/or privilege for their actions in causing the breach of the contracts that Plaintiff had with Rosenthal Collins Securities. Plaintiff Smith contends that RCG is vicariously liable for the acts of its agents CEO Michael Downs, Defendants Downs and Kitchen for the tortious interference with the business relationship that Plaintiff had with Rosenthal Collins Securities, inasmuch as Plaintiff Smith was ready and able to perform his part of the business arrangements Plaintiff had with Rosenthal Collins Securities at the time of the breach and termination.

Plaintiff Smith contends he suffered significant damages as a result of the tortious interference with the business relationship that Plaintiff had with Rosenthal Collins Securities. If the parties to the business relationship Plaintiff had with Rosenthal Collins Securities had been allowed to perform their responsibilities under that relationship, Plaintiff Smith estimates that he would have been able to earn at least $7,093,160 from the date of his discharge extending until his retirement age of 65 or 20 years. Plaintiff Smith also suffered consequential damages for out-of-pocket expenses connected to the setting up of his securities business for marketing and licensing requirements of approximately

15

$36,000.

Plaintiff Smith also seeks damages for emotional distress and harm to his business reputation in an amount to be determined at trial by the fact-finder.

## CONTENTIONS OF DEFENDANT

## Factual Contentions of Defendants

Plaintiff, along with Defendant Kitchen, Charles Ross and Patrick McClatchey were employed as commodities brokers by J.C. Bradford until October 1999, when J.C. Bradford dissolved its commodities business. At that time, Defendant Kitchen was approached by RCG to work as Managing Director and Defendant Kitchen recruited the other three individuals to set up a Memphis office of RCG. Plantiff, Ross and McClatchey then entered into a Branch Office Agreement which memorialized the terms of their agreement, including the manner in which office expenses were to be divided. Plaintiff, Ross and McClatchey were jointly liable for the office expenses, including the rent for the office space. They were all employees of Rosenthal Collins Group and none had supervisory authority over the others. The Memphis office of RCG consisted of Plaintiff, Ross, McClatchey, Jenny Miller and Jackie Russell, the Office Manager who also had no supervisory authority over the other individuals.[1]

Shortly after the Memphis office of RCG was established, Plaintiff began to engage in actions which were unacceptable to RCG and which ultimately led to Plaintiff's

---

[1]NFA regulations require that each office designate an "office manager"for compliance purposes. Ms. Russell bore the title of Office Manager for compliance purposes only, and did not have disciplinary or hire/fire authority over any of the brokers.

16

termination.  First, Plaintiff began suffering substantial losses in his personal trading account.  The brokers are permitted to maintain personal house accounts and conduct trades on their own behalf.  Plaintiff began to trade his account excessively and suffered significant losses.  For example, for the years 1999, 2000 and the first seven months of 2001, Plaintiff suffered losses in the amounts of $16,623.00, $132,486.00, and $119,999.00, respectively.

Plaintiff also began to suffer a dramatic loss in his production.  Over the period of November 1999 to June 2001, Plaintiff's monthly commission payouts dropped from $16,784 to a negative ($3,904.00).  Finally, Plaintiff began to have extremely erratic attendance in the office.  More often than not, Plaintiff would not make it to the office until the afternoon.

Because most of the commodities markets in which Plaintiff traded opened in the early hours of the morning and closed in the early afternoon, this became a cause for great concern.  Plaintiff's typical pattern was to call the office around 9:00 to let the office staff know he would be in at 10:00, for example, but would then not show up until early afternoon.  This put the office staff in a very difficult position with regard to Plaintiff's clients because they could not accurately advise the clients as to Plaintiff's whereabouts.  Further, the office staff was not able to reach Plaintiff when emergencies arose with one of his clients. This erratic attendance continued and worsened  despite numerous counseling sessions between Defendant Doug Kitchen and Plaintiff.

All of these factors culminated in an unacceptable situation for RCG for several reasons. First, RCG bore an enormous risk from Plaintiff's personal losses.  Plaintiff's drop

in production was a negative. This, when coupled with his enormous losses, demonstrated to RCG that Plaintiff was rapidly losing control over his and his clients' accounts. Finally, Plaintiff's poor attendance caused RCG great concern with regard to its potential liability in the event a customer emergency arose during the time Plaintiff was unreachable.

As a final last straw, Plaintiff had a client named Jon Porter with whom he wanted to develop a securities business under the supervision of RCS, a sister company of RCG. Plaintiff's idea was that this business would have operated from the RCG office in Memphis. Porter had a poor reputation in the securities community and RCG determined that they did not want him associated with the RCG office. Moreover, Porter had a margin call with RCG which came due and which Porter refused to satisfy. Ultimately, Porter attempted to pay the margin call with a stolen third-party check. The principals of RCS, who were the common owners of RCG, determined that they also did not want any business relationship with Porter. Plaintiff was angered by this decision and developed a very hostile attitude toward RCG as a result.

Defendants made great efforts to attempt to salvage Plaintiff as an employee during this time period. Defendant Kitchen met with Plaintiff on several occasions to encourage him to stop trading in his own account and to focus instead on rebuilding his business. Plaintiff did not improve in either respect and, rather, continued to exhibit continually worsening performance. Finally, RCG made the decision to terminate his employment. After Plaintiff was informed that his employment was being terminated, and due in large part to a request by Plaintiff's coworkers, Defendants decided to give Plaintiff a second chance to salvage his employment. As a condition for this second chance, Defendants

18

asked Plaintiff to agree to a "five-point plan" which would require Plaintiff to agree to the following:

1.   Plaintiff would not trade in his personal account;

2.   Plaintiff would be present in the office during normal trading hours and at a minimum those hours during which his customers had positions in the market;

3.   Plaintiff would service his customer accounts in a professional manner consistent with industry practices;

4.   Plaintiff would require his customers to meet margin calls promptly and in accordance with industry practices;

5.   Plaintiff would have no dealing with Jon Porter that involved either securities or commodity business while at RCG.

Plaintiff refused to accept these terms and his employment was then terminated. Immediately following his termination, Plaintiff's hostility towards RCG escalated dramatically. Plaintiff planned to continue to work from the RCG office. The day after his termination he brought his wife and nine-year old daughter to the office to "race" the RCG office staff to the telephones. His daughter was instructed to answer the telephones "Rosenthal Goodsmith, " the name of a fictional company. For obvious reasons, RCG customers became confused and many hung up. When Defendant Kitchen became aware of these events, he confronted Plaintiff about the fact that he was jeopardizing his commodities license by attempting to service customers when he was not affiliated with a supervisory firm. Plaintiff ultimately moved from this office space and set up his office in

19

another location.

While Plaintiff he was employed with RCG, Defendants Downs and Kitchen met on a regular basis with their CEO, Michael Downs. During these meetings, Downs was advised of Plaintiff's activities so that RCG could make a decisions with regard to Plaintiff's employment, and after his termination, with regard to RCG's office sharing arrangement with Plaintiff. Downs was also an owner of RCS who made decisions and had input into RCS's decisions with regard to its brokers. At no point did Defendant Downs and Kitchen take any actions with regard to Plaintiff which were outside the scope of their employment with RCG. Plaintiff is not entitled to any damages from the Defendants.

Defendants contend that Plaintiff does not have a disability, as that term is defined under the Americans with Disabilities Act. Defendants further contend that they had no knowledge of Plaintiff's alleged bipolar condition, that Plaintiff was not regarded as having an impairment that substantially limited him in one or more major life activity and that he was, in fact, terminated for a legitimate, non-discriminatory reason.

Defendants contend that Plaintiff was terminated "for cause" and, therefore, Plaintiff was not entitled to the 120-day notice period set forth in the Branch Office Agreement.

Defendants contend that Plaintiff did not have an existing business relationship with RCS. Moreover, because RCS is RCG's sister company with common ownership, it did not stand as a third-party to RCS. Therefore RCG cannot be held to have tortiously interfered with Plaintiff's alleged business relationship with RCS. Defendants further contend that Defendants Downs and Kitchen acted at all times in the course and scope of their authority with RCG and, therefore, cannot be individually liable to Plaintiff for any

tortious interference with his alleged business relationship with RCS.  None of the Defendants acted with an improper motive or improper means with regard to Plaintiff's alleged relationship with RCS or intended to cause the termination of that alleged relationship.  Moreover, Plaintiff did not suffer any damage as a result of the termination of his alleged relationship with RCS.

Finally, Defendants contend that Plaintiff is not entitled to any damages sought in his complaint.  To the extent this Court finds that Plaintiff is entitled to compensatory damages, Defendants contend that any such amount must be reduced any amounts earnable by Plaintiff through reasonable efforts to mitigate.  Defendants further contend that Plaintiff is not entitled to an award of punitive damages because no Defendant acted with malice or reckless indifference towards Plaintiff.

## CONTESTED ISSUES OF LAW

### PLAINTIFF

Plaintiff expects the following issues of law to be litigated:

1.      Whether Defendants are in violation of the Americans with Disabilities Act for terminating Plaintiff Smith from his position as a futures broker with Defendant RCG because of their perception that he could not perform his duties in connection with that position due to his inability to cognitively think and cope with the combined tasks of selling commodity futures and equity securities.

2.      Whether Defendants breached Plaintiff's contract of employment embodied in the Branch Office Agreement when they terminated Plaintiff without notice as provided

by the contract.

3.      Whether Defendants tortiously interfered with the business relationship that Plaintiff had established with Rosenthal Collins Securities, LLC.

4.      Whether and to what extent Plaintiff is entitled to relief in this cause.

## **DEFENDANTS**

The Defendants expect the following issues of law to be litigated:

1.      Whether Plaintiff has a disability as that term is defined by the Americans with Disabilities Act.

2.      Whether Plaintiff had an impairment that substantially limited one or more major life activities.

3.      Whether Plaintiff was unwilling or unable to perform the essential functions of the job with or without  reasonable accommodation.

4.      Whether Plaintiff ever requested an accommodation.

5.      Whether Plaintiff was able to work in a broad class of jobs.

6.      Whether Plaintiff ever made Defendants aware of his disability.

7.      Whether any accommodation of Plaintiff would have caused an undue hardship to Defendants.

8.      Whether Defendants regarded Plaintiff him as having an impairment that substantially limited one or more of his major life activities.

9.      Whether Plaintiff was otherwise qualified to perform his job.

10.      Whether Plaintiff was terminated from employment because Defendants regarded him as disabled.

11.    Whether Defendants terminated Plaintiff for a legitimate non-discriminatory reason.

12.    Whether, if some impermissible motive were a factor in any employment action with respect to Plaintiff, a claim which Defendants expressly deny, the same decision would have been reach for legitimate business reasons.

13.    Whether Plaintiff failed and/or refused to perform all conditions precedent to any oral, written, or implied contract.

14.    Whether Plaintiff's action, in whole or part, is barred by failure of consideration for the alleged contract.

15.    Whether Defendants took any action in breach of the Branch Office Agreement.

16.    Whether Defendants terminated Plaintiff "for cause," thereby negating the requirement for 120 days notice under the Branch Office Agreement.

17.    Whether Plaintiff had an existing business relationship with RCS.

18.    Whether the Defendants' intended to cause the breach or termination of the business relationship.

19.    Whether the Defendants acted with and improper motive or improper means.

20.    Whether, and the extent to which, Plaintiff suffered damages as a result.

21.    Whether Defendants' acts if any, in reference to the matters and things alleged in the Complaint were unintentional so as to bar or reduce recovery herein.

22.    Whether Plaintiff's action is barred to the extent that Plaintiff comes to this court with unclean hands directly related to the matters alleged herein.

23.    Whether if Plaintiff suffered any injury or damage, as alleged, said injury and/or damage was proximately caused or contributed to by Plaintiff's own conduct, including, but not limited to, carelessness, recklessness, consent, comparative negligence and/or breach of contract, covenants and conditions on their part to be performed, thereby reducing or barring his claims against Defendants

24.    Whether the acts, omission or conduct of Defendants Downs and Kitchen were outside the course and scope of their employment with Defendant RCG and, if so, whether Defendant RCG can be held liable for any such actions.

25.    Whether Plaintiff is entitled to any compensatory damages and, if so, the amount of such damages.

26.    If Plaintiff is entitled to compensatory damages, whether Plaintiff made reasonable efforts to mitigate.

27.    Whether Defendants or any of their officers, directors or managing agents committed any discriminatory practices or engaged in any tortious conduct with malice or reckless indifference towards Plaintiff's federally protected rights such as would entitle him to punitive damages.

## STIPULATED FACTS

The parties contend will file fact stipulations at or before the Pretrial Conference.

## EXHIBITS

The parties will submit objections to exhibits before the Pretrial Conference. *Not rec'd as of Sept. 19, 2005*

Plaintiff Smith's exhibit list is attached to this Order as Exhibit A.

Defendants' exhibit list is attached to this Order as Exhibit B.

24

## EVIDENTIARY DISPUTES KNOWN OF BEFORE TRIAL

There were no evidentiary disputes at the time of the drafting of this proposed pretrial order.

## WITNESSES

### PLAINTIFF

The names of the witnesses who **WILL** be called by the Plaintiff are:  Plaintiff, Joseph D. Smith.

The names of the witnesses who **MAY** be called by the Plaintiff are: Custodian of Records for Defendants; Deborah Smith, Maureen C. Downs; Douglas O. Kitchen; Patrick McClatchy; Charles J. Ross; Jackie Russell; Jenny Miller; Carol Zajac; David Shoaf; Jon C. Porter; Eric Glenn; James Ensor, M.D.; Frank T. Masur, Ph.D.; Ben L. Beatus, Jr. M.D.; Joel A. Reisman, M.D.

Plaintiff may rely on the deposition testimony of unavailable witnesses.  Copies of all deposition transcripts will be filed with the Court on or before September 19, 2005. Before the transcripts are filed, Plaintiff will file designations of portions of the persons' depositions that are to be either read into the record at trial or whose video-taped deposition may be shown at trial.

Further, Plaintiff reserves the right to call any witnesses listed by the Defendants.

### DEFENDANTS

The names of witnesses who **WILL** be called by the Defendants are: Plaintiff, Joe Smith; Defendant Douglas Kitchen; Defendant Maureen Downs.

The names of witnesses who **MAY** be called by the Defendants are: Patrick

25

McClatchey; Charles Ross; Jackie Russell; Jenny Miller; Deborah Smith; Carol Zajac; David Shoaf; James Ensor, M.D.; Frank T. Masur, Ph.D.; Ben L. Beatus, Jr. M.D.; Joel A. Reisman, M.D.; Carma Johnson; Richard Horgan; George Spaniak, Jr.; Dennis Nolte; Michael Downs; Terry Baptie.

Defendants also may call any witness listed by the Plaintiff and any additional witnesses necessary for rebuttal.

## TRIAL

The trial is currently set for September 26, 2005. If the parties can reach an agreement as to the admissibility of all exhibits, this trial should take less that five days.

**IT IS SO ORDERED** this ___19___ day of September, 2005.

**JON PHIPPS MCCALLA**
**UNITED STATES DISTRICT JUDGE**

APPROVED FOR ENTRY:

*Carolyn Howard w/ permission*

Carolyn Howard       #006744
Jeffery Atchley        #012370
**NORWOOD, HOWARD & ATCHLEY**
1407 Union Avenue, Suite 807
Memphis, Tennessee  38104
(901) 276-7676

Attorneys for Plaintiff Joseph D. Smith


*[signature]*

Thomas Henderson     #11526
Kimberly Hodges       #20809
**LEWIS   FISHER   HENDERSON
CLAXTON & MULROY, LLP**
6410 Poplar Avenue, Suite 300
Memphis, Tennessee 38119
(901) 767-6160

Attorneys for Defendants Rosenthal
Collins Group, LLC, Maureen Downs,
and Douglas Kitchen

27

## PLAINTIFF'S EXHIBIT LIST

1.    All exhibits identified through the evidentiary deposition of Dennis Nolte taken on September 24, 2004 and on which there were no objections;

2.    Branch Office Agreement between RCG and the Memphis brokers;

3.    J.C. Bradford Contract of sale to Plaintiff, Charlie Ross, and Pat McClatchy for office contents, Koger lease and phone number assignment;

4.    Active Futures Contract Specifications, dated August 2004;

5.    RCG Employee handbook and compliance manual;

6.    Form 8-T from RCG on Plaintiff Smith;

7.    National Futures Association Individual Withdrawal Template;

8.    Plaintiff Smith's Daytimer calendar for January through July 2001;

9.    Third Party Transactions policy of RCG;

10.   Charge of Discrimination to EEOC by Plaintiff Smith;

11.   Certified copy of RCG's Position Statement to the EEOC;

12.   Medical file of Plaintiff Smith maintained by James Ensor, M.D.;

13.   Medical file on Plaintiff Smith maintained by Frank T. Masur, Ph.D.;

14.   RCG Commission Pay-outs and Earnings Statements for Plaintiff Joseph Smith, Patrick McClatchy, and Charles Ross, dated November 1999 through September 2001;

15.   Summaries prepared by Plaintiff Smith of Commission Pay-outs and Earnings for Plaintiff Joseph Smith, Patrick McClatchy, and Charles Ross, dated November 1999 through September 2001;

**EXHIBIT**

_A_

16.  Plaintiff Smith's Futures and Securities business earnings from J.C.Bradford for years 1996, 1997, 1998 and projected 1999 through 10/14/99;

17.  Plaintiff Smith's Production figures between 1994 through 2000 while employed at  Prudential Securities, J. C. Bradford, and RCG;

18.  NBC Trust Documents, pertaining to setting up Plaintiff's business to handle Individual Retirement Accounts (IRAs) and Pension dollars as specified in Plaintiff's business plan and "Memo" to Doug Kitchen in July 2000;

19.  Plaintiff Smith's Memorandum to Doug Kitchen, dated July 31, 2000;

20.  Affidavit of Michael Downs, identified through the evidentiary deposition of Michael Downs, taken on April 8, 2005 and on which there were no objections;

21.  Printed emails between Eric Glenn and Plaintiff Smith, dated 06/13/01, 06/20/01, 06/27/01, 06/29/01, 07/09/01, 07/11/01;

22.  Production history for Jon Porter, dated 07/26/01;

23.  Form 1099-MISC issued to Eric Glenn for 2001 for $19,000;

24.  Earnings and expense summary from Huntleigh Securities Corp. for Plaintiff Smith for the months of September, October, and November 2001;

25.  Earnings and expense summaries from Mutual Securities, Inc. for Plaintiff Smith for January 2002;

26.  Tax returns of Plaintiff Smith for calendar years 1995, 1996, 1997, and

2

1998;

27.  Tax returns of Plaintiff Smith for calendar years 1999, 2000, 2001, 2002, 2003, and 2004;

28.  Promissory Note of Jon Porter, dated 5/30/01;

29.  Customer Master File of Plaintiff Smith, dated 12/13/01;

30.  Damages calculations for each claim to be tried which have been prepared by Plaintiff and his counsel.

Plaintiff reserves the right to use any and all exhibits listed by the Defendants.

**EXHIBIT A**

3

## DEFENDANT'S EXHIBIT LIST

1. RCS Request Withdrawal August 21, 2003. Bates Nos. A0000001 – A0000004.

2. RCS Focus Report. Bates Nos. A0000005 – A0000017.

3. RCS Financial Statements. Bates Nos. A0000018 – A0000034.

4. RCS Authorization. Bates No. A0000035.

5. RCS Registration Fee Summary. Bates No. A0000036.

6. RCS Registered Representative Profile. Bates Nos. A0000037 – A0000043.

7. Independent Contractor's Agreement, October 29, 1999. Bates Nos. A0000044 – A0000055.

8. October 29, 1999 Correspondence transmitting U-5 Form. Bates Nos. A0000060 – A0000063.

9. Credit Report for John Porter. Bates Nos. A0000064 – A0000069.

10. Form U-5, August 15, 2001. Bates Nos. A0000071 – A0000074.

11. U-4 Application (RCS). Bates Nos. A0000075 – A0000120.

12. RCS Statement. Bates Nos. A0000128 - A0000130.

13. RCS Brokerage Account Form / Outside Business Disclosure. Bates Nos. A0000135 – A0000136.

14. July 31 Memo from Plaintiff to Doug Kitchen. Bates Nos. A0000207 – A0000212.

15. 2001 Trading Profit and Loss Statement for Joe Smith. Bates No. A0000214.

16. 1999 through 2001 Summary of Volume for Joe Smith. Bates No. A0000215.

17. June 2001 Volume Summary for Joe Smith. Bates No. A0000216

18. July 2 through July 6, 2001 Summary of Margin Deficiencies for Joe Smith. Bates No. A0000217.

19. October 1999 through July 2001 Summary of Commission Payouts for Joe Smith. Bates No. A0000218.



EXHIBIT

B

20. October 1999 through July 2001 Summary of Commissions Versus Trading Losses for Joe Smith. Bates No. A0000219.

21. July 31, 2000 Memo from Plaintiff to Doug Kitchen. Bates Nos. A0000220 – A0000225.

22. November 1999 through July 2001 Commission Payout Schedule. Bates No. A0000226.

23. Personal Account Statements for Joe Smith. Bates Nos. A0000230 – A0000253.

24. June 2001 Commission Payouts for Joe Smith. Bates Nos. A0000254.

25. October 1999 through July 2001 Statement of Commission Payouts for Joe Smith. Bates Nos. A0000260 – A0000322.

26. 1099-B Statements. Bates Nos. A0000232 – A0000338.

27. Facsimile regarding John Porter's check. Bates No. A0000355.

28. November 19, 2001 Letter to Plaintiff regarding Assignment of Promissory Note. Bates Nos. A0000450 – A0000452.

29. Correspondence from Maureen Downs to Plaintiff and Attachments. Bates Nos. A0000863 – A0000884.

30. Plaintiff's Personnel File. Bates Nos. A0000885 – A0000959.

31. Notes of Charlie Ross regarding Joe Smith. Bates Nos. A0000968 – A0000971.

32. Notes of Jenny Miller regarding Joe Smith. Bates Nos. A0000972 – A0000979.

33. Negative Response Letter, August 1, 2001. Bates No. A0000985.

34. August 16, 2001 Memo to Joe Smith from Jackie Russell. Bates No. A0000987.

35. Form 3R and 8T. Bates Nos. A0000993 – A0000995.

36. Negative Response Letter, August 9, 2001. Bates No. A0000996.

37. Assignment Agreement. Bates Nos. A0000997 – A0001002.

38. Affidavit of Mike Downs. Bates No. A0001004.

39. Night Orders, October 20, 1998 through August 16, 2001. Bates Nos. A010105 – A010486.

40. John Porter Commodities Statements. Bates Nos. A011276 – A011317.

41. Documents regarding John Porter's stolen check. Bates Nos. A011318 – A011329.

42. Third-Party Transaction Memo. Bates No. A011330.

43. Personal Trading Account Statements for Charlie Ross, November 1999 through July 2001. Bates Nos. A011609 – A011621.

44. Personal Trading Account Statements for Pat McClatchy, November 1999 through July 2001. Bates Nos. A011444 – A011608.

45. Personal Trading Account Statement for Joe Smith, November 1999 through July 2001. Bates Nos. A011622 – A014100.

46. Commission Payout Records, November 1999 through September 2001. Bates Nos. A014101 – A014146.

47. Medical Records from Dr. Beatus. Bates Nos. A014566 – A014585.

48. Medical Records from Dr. Boswell. Bates No. A014586 – A014629.

49. Medical Records from Dr. Ensor. Bates Nos. A014630 – A014661.

50. Medical Records from Regional Medical Center. Bates Nos. A014662 – A014767.

51. Medical Records from Masur. Bates Nos. A014769 – A014778.

52. July 27, 2001 Correspondence from Maureen Downs to Joe Smith (Produced by Plaintiff).

53. Branch Office Agreement dated September 27, 9999 (Produced by Plaintiff).

54. EEOC Charge of Discrimination dated May 17, 2002 (Produced by Plaintiff).

55. Tax Returns and Supporting Documentation for Year 1999 (Produced by Plaintiff).

56. Tax Returns and Supporting Documentation for Year 2000 (Produced by Plaintiff).

57. Tax Returns and Supporting Documentation for Year 2001 (Produced by Plaintiff).

58. Tax Returns and Supporting Documentation for Year 2002 (Produced by Plaintiff).

59. Tax Returns and Supporting Documentation for Year 2003 (Produced by Plaintiff).

60. Tax Returns and Supporting Documentation for Year 2004 (Produced by Plaintiff).

61. Negative Response Letter, August 9, 2001 with Handwritten Notes by Joe Smith Contained in Folder No. 19 (Produced by Plaintiff).

62. Exhibits from Deposition of Plaintiff Joe Smith.

63. Exhibits from Deposition of Dennis Nolte.

64. Exhibits from Deposition of Michael Downs.

65. D. Kitchen Dayrunner Entries.  Bates Nos. A0000965 – A0000967.

66. J. Russell Notes re Plaintiff, Joe Smith.  Bates Nos. A0000981 – A0000984.

67. Customer Master File.  Bates Nos. A0000361 – A0000399.

68. Monthly Commodity Statements.  Bates Nos. A0000400 – A0000440.

69. Status of Plaintiff, Joe Smith Customer Debt.  Bates No. A0000441.

70. Monthly Commodity Statements re IRS Account.  Bates Nos. A0000442 – A0000449.

71. Monthly Commodity Statements re Plaintiff, Joseph Smith.  Bates Nos. A0000453 – A0000862.

72. Faxed Memo from Plaintiff to Terry Baptie. Bates Nos. A0000358 – A0000360.

73. Plaintiff's Answers to Defendant's First Set of Interrogatories.

74. Medical Records from Lakeside.

75. All Exhibits identified by Plaintiff.

76. Any and all Exhibits necessary for impeachment or rebuttal.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 109 in case 2:03-CV-02360 was distributed by fax, mail, or direct printing on September 19, 2005 to the parties listed.

---

Carolyn Howard
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Jeffery Atchley
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Melissa Kimberly Hodges
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Thomas L. Henderson
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Honorable Jon McCalla
US DISTRICT COURT