IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY ulre D.C.

05 DEC 22 PM 4: 27

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | |
|---|---|
| JOSEPH D. SMITH, | ) |
| Plaintiff, | ) |
| v. | ) No. 03-2360 Ml/An |
| ROSENTHAL COLLINS GROUP, LLC, | ) |
| Defendant. | ) |

## OPINION AND ORDER FOLLOWING NON-JURY TRIAL

The Court held a non-jury trial in this case from September 26, 2005, through September 29, 2005. Plaintiff Joseph D. Smith was represented by Carolyn Howard, Esq. and Jeffery Atchley, Esq. Defendant Rosenthal Collins Group, LLC, ("RCG"), was represented by Thomas L. Henderson, Esq. and Kimberly Hodges, Esq. In this action, Plaintiff seeks relief for discrimination based on a perceived disability pursuant to the Americans with Disabilities Act of 1990 ("ADA") and for breach of contract.

Plaintiff testified at trial and called seven witnesses to testify in his case-in-chief: Maureen Downs ("Downs"), Douglas Kitchen ("Kitchen"), Charles Ross, Jackie Russell, Jenny Miller, Patrick McClatchy, and Deborah Smith. In addition, Plaintiff played the videotaped depositions of Dennis Nolte, Michael A. Downs, and George Spaniak, Jr. Defendant called Downs and Kitchen to testify.

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 12-27-05

117

For the reasons set forth in this opinion, the Court finds that Plaintiff has failed to prove his claims of discrimination under the ADA and breach of contract. Accordingly, judgment is ENTERED in favor of Defendant.

I.    **FINDINGS OF FACT**

Plaintiff worked at the Memphis branch office of RCG, a futures commodity trading firm, from October 1999 until he was terminated in July of 2001. Prior to Plaintiff's termination, the RCG branch office in Memphis consisted of three brokers—Plaintiff, Charles Ross, and Patrick McClatchy—and two full-time sales assistants, Jenny Miller and Jackie Russell. (Ex. 1.) Jackie Russell was also the Branch Manager. Douglas Kitchen, an RCG managing director, supervised the brokers at the Memphis branch office. Maureen Downs, an RCG executive vice president and Kitchen's supervisor, had general oversight responsibility over all of the brokers at RCG.

When the Memphis branch office was created, Plaintiff, Ross, and McClatchy entered into a Branch Office Agreement ("Agreement") with RCG. The Agreement's terms included a provision that Plaintiff, Ross, and McClatchy were jointly liable for the office expenses, including the rent for the office space. (Ex. 37.) The Agreement also provided: "Either party may terminate this agreement with 120 days notice. If RCG terminates its relationship with Broker(s) for cause, no notice period will

be required. In the event of termination, the parties will cooperate to wind-up the affairs in a fair and orderly manner. RCG agrees to reassign the accounts of Brokers to a clearing firm of their choice." (Ex. 37.)

In late 2000, Plaintiff underwent psychiatric testing and was subsequently diagnosed with bipolar disorder. (Exs. 59, 62.) Upon learning this information, Plaintiff informed his fellow brokers, McClatchy and Ross, and the sales assistants, Russell and Miller, of his condition. Plaintiff told his supervisor, Kitchen, twice of his diagnosis—once at a meeting in Nashville, Tennessee, in April 2001, and later at a meeting in Jackson, Tennessee, on July 6, 2001.

During Plaintiff's employment at RCG, he suffered large losses in his personal trading account.[1] From October through December of 2001, Plaintiff lost $8,275 in his personal account, and in 2000, Plaintiff lost $182,221 in his personal account. In the first seven months of 2001, Plaintiff lost $119,231 in his personal account. (Ex. 65.) Plaintiff's personal trading losses greatly exceeded the profits in his clients' accounts. (Ex. 65.) In addition, during the last three month of his employment—May, June, and July of 2001—Plaintiff's expenses exceeded his commissions, resulting in negative payouts for those months.

---

[1] Although this account was for the purpose of Plaintiff's personal trading, RCG was ultimately responsible for any losses incurred.

(Ex. 68.) In May and June of 2001, the last two months of Plaintiff's employment, his trading volume reached an all-time low and fell significantly below his average for the previous year and a half. (Ex. 66.)

In approximately April of 2001, one of Plaintiff's clients, Jon Porter, gave RCG a third-party check, which later turned out to have been stolen, to cover a deficit in his account. RCG obtained a promissory note from Porter, but Porter failed to pay RCG the money he owed when his promissory note came due, in July 2001.

Plaintiff's attendance in the office during regular trading hours was inconsistent and erratic. RCG expected its brokers to be in the office from 7 a.m. until 3:15 p.m., which is when most trading takes place. In 2001, Plaintiff often did not come to the office until the mid-morning or afternoon. The sales assistants frequently had trouble reaching him when clients called. Sometimes, Plaintiff would tell them that he would be arriving at the office at a particular time but then would fail to arrive until much later. RCG's corporate staff, including Maureen Downs, also had difficulty reaching Plaintiff at the office.

In light of these problems with Plaintiff's job performance, Downs requested that Kitchen meet with Plaintiff in July of 2001. Plaintiff and Kitchen met on July 6, 2001, and discussed, among

other matters, Plaintiff's large losses in his personal trading account. Kitchen recommended that Plaintiff stop trading in his personal account and focus on his futures commodities trading base instead. Kitchen also advised Plaintiff not to enter into any business partnerships with Plaintiff's client, Jon Porter, because of Porter's failure to cover adequately his account deficits, as described above.

Also in July 2001, Downs spoke with her supervisor, RCG's Chief Executive Officer, Michael Downs,[2] and recommended that Plaintiff be terminated. Michael Downs approved the termination, and on July 12, 2001, Downs and Kitchen called Plaintiff and informed him that he would be terminated from employment with RCG. On July 18, 2001, Downs and Kitchen called Plaintiff again and told Plaintiff that he could continue to work at RCG if Plaintiff accepted the terms set forth in their "Five-Point Plan." The plan required Plaintiff to: (1) stop trading in his personal account; (2) be present in the office during normal trading hours; (3) service his customer accounts in a professional manner consistent with industry practices; (4) require customers to meet margin calls; and (5) discontinue his dealings with Jon Porter. Plaintiff refused to accept the terms of the plan and was subsequently terminated on July 27, 2001. The reason provided for Plaintiff's termination in the Notice of

---

[2] Michael Downs and Maureen Downs are not related.

5

Termination submitted by RCG to the Commodity Futures Trading Commission and the National Futures Association on August 13, 2001, was "absenteeism during market hours." (Exs. 2, 3.)

## II. CONCLUSIONS OF LAW AND ANALYSIS

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8); see also Kocsis v. Multi-Care Mgt., 97 F.3d 876, 882 (6th Cir. 1996). In order to prove that he is disabled under the ADA, a plaintiff must show that he: (1) has a physical or mental impairment that substantially limits one of more of his major life activities; or (2) has a record of such an impairment; or (3) is regarded by his employer as having such an impairment. 42 U.S.C. § 12102(2)(emphasis added); see also Kocsis, 97 F.3d at 882.

In this case, Plaintiff does not claim that his bipolar disorder constitutes a disability; instead, he argues that he is disabled under the meaning of the ADA because he was regarded as disabled by his emplyoer. The Supreme Court has noted that there

6

are two ways that an individual may be regarded as disabled: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).

A plaintiff may support his claim of discrimination under the ADA with either direct or circumstantial evidence of discrimination. Where a plaintiff points to circumstantial evidence of discrimination, his claim is analyzed under the framework for deciding discrimination cases set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Kocsis, 97 F.3d at 882. Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of disability discrimination by proving that: (1) he was "disabled" within the meaning of the Act; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision with regard to the position in question; (4) the employer knew or had reason to know of his disability; and (5) the position remained open after the adverse employment decision or the disabled individual was replaced. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1185

(6th Cir. 1996); Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 661 (6th Cir. 1999).

If the plaintiff establishes the elements of a prima facie case of disability discrimination, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. Kocsis, 97 F.3d at 883. "If the defendant carries that burden of production, the plaintiff must then prove 'by a preponderance of the evidence' that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." Id. (citing Texas Dept't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

In order to show that the defendant's reasons were pretextual, a plaintiff must prove that: (1) the proffered reasons had no basis in fact; or (2) the proffered reasons did not actually motivate the action; or (3) they were insufficient to motivate the action. Id. (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)). At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place. Id. (citing Burdine, 450 U.S. at 253).

### A. Prima Facie Case

As set forth above, to establish a prima facie case that he was regarded as disabled under the McDonnell Douglas burden

8

shifting scheme, Plaintiff must show that his employer treated him as having an impairment that substantially limits one or more of his major life activities, that he is otherwise qualified to perform the essential functions of his job, and that he suffered an adverse employment decision because his employer regarded him as disabled. Sullivan v. River Valley School Dist., 197 F.3d 804, 810 (6th Cir. 1999). In this case, Plaintiff has failed to make the required showing.

### 1. Treated as Having an Impairment that Substantially Limits Major Life Activities

The Court finds that Plaintiff failed to establish a prima facie case that he was regarded as disabled because Plaintiff failed to establish that Maureen Downs—the ultimate decision-maker with regard to Plaintiff's termination—perceived Plaintiff as disabled. Significantly, Plaintiff failed to prove that Downs was even aware of Plaintiff's condition.

Plaintiff testified that he never mentioned his bipolar condition to Downs, and Downs testified that no one, including Kitchen, had ever informed her of Plaintiff's condition. Downs also testified that she had no independent knowledge of Plaintiff's symptoms or medications and that the first time she learned of his condition was when Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff testified that he told Kitchen twice of his bipolar condition—at meetings in April 2001 and July 2001—which Kitchen

9

denies. Even if Kitchen was aware of Plaintiff's condition, however, there is no evidence that he communicated this information to Downs, who made the decision to terminate Plaintiff's employment at RCG.

Even if Downs or Kitchen did have knowledge of Plaintiff's bipolar condition, however, mere knowledge of his condition is insufficient to support a finding that they regarded him as having a "disability" as it is defined under the ADA, as an "impairment that . . . substantially limit[s] major life activities." See Sullivan v. River Valley School Dist., 197 F.3d 804, 810 (6th Cir. 1999)("[A] defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled."); Gardull v. Perstorp Polyols, Inc., 382 F. Supp. 2d 960, 965 (N.D. Ohio 2005)("[W]hile [employer] knew of [plaintiff's] status as a recovering drug addict, [plaintiff] has presented no evidence that he had a record of or was regarded . . . as having an impairment that substantially limited a major life activity, and such a conclusion does not follow from the employer's mere knowledge of [plaintiff's] condition.")

The only evidence that Kitchen might have perceived Plaintiff's condition as a disability is Plaintiff's testimony that Kitchen stated that he wanted "the old Joe back" at their July 6, 2001, meeting in Jackson. Plaintiff testified that he

10

understood this comment to mean that Kitchen preferred Plaintiff to be more hyperactive, the way Plaintiff was before he started taking medicine to control his bipolar disorder. Regardless of what Kitchen may or may not have been implying, however, one vague statement that possibly relates to Plaintiff's mental condition does not support a finding of discrimination. See Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 661 (6th Cir. 1999)("The isolated and ambiguous comment made by [co-worker] about 'the guy on Prozac,' assuming that such a comment was made, does not establish direct evidence of discrimination."); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 380 (6th Cir. 1993)(holding that "isolated and ambiguous statements . . . are too abstract, . . . to support a finding of discrimination").

Moreover, even if Kitchen was aware of Plaintiff's condition and diagnosis, there is no evidence that he communicated this information to Downs, who ultimately made the decision to fire Plaintiff. Whether or not Kitchen made comments or held opinions about Plaintiff's fitness for continued employment with RCG is not relevant where there is no evidence that the ultimate decision-maker considered any improper information. See Sebest v. Campbell City Sch. Dist. Bd. of Educ., 94 Fed. Appx. 320, 327 (6th Cir. Apr. 8, 2004)(holding discussions regarding employee's health by one member of school board did not influence decision of other board members, in part because no evidence that member's

11

views were shared with or considered by other board members). Accordingly, the Court finds that Plaintiff was not regarded as disabled under the meaning of the ADA.

### 2. Otherwise Qualified

Even if the Court had determined that Plaintiff was regarded as disabled, Plaintiff would have to establish that he was otherwise qualified for his position in order to make out a prima facie case of discrimination. See Monette, 90 F.3d at 1185. "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." Gardull v. Perstorp Polyols, Inc., 382 F. Supp. 2d 960, 965 (N.D. Ohio 2005)(quoting Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998)). The evidence at trial showed that while RCG did not have an official attendance policy for its brokers, Plaintiff's absence from the office during regular trading hours was excessive and disruptive. Charles Ross, one of the brokers in RCG's Memphis branch office, described Plaintiff's attendance at the office as "erratic," and had expressed his concern to Downs and Kitchen. The branch manager and sales assistant, Jackie Russell, testified that in the last six months of his employment, Plaintiff came in late approximately three days per week. She also stated that Plaintiff was sometimes absent without explanation and that when he did call to say that he would be late, he often failed to

arrive when he said he would. Russell was aware that Plaintiff traded in after-hours markets, as well as during regular trading hours, but, she testified, most of Plaintiff's after-hours trading was in his personal account.

Most significantly, Downs testified that it was part of the brokers' job responsibilities to be in the office during "regular trading hours," which were from 7 a.m. until 3:15 p.m. According to Downs, 95 to 97 percent of the trading and most of the important market action takes place during this time period. In addition, Downs testified that it is important for brokers to be in the office during regular trading hours because the corporate staff need to be able to speak with brokers during the day. Downs also testified that in the fall of 2000 and in the spring of 2001, there were several instances when she needed to speak with Plaintiff about problems with his customer accounts, but that she was unable to reach Plaintiff by telephone during regular trading hours.

Plaintiff failed to come forward at trial with any credible evidence to contradict Defendant's proof of his deficient attendance in the office during regular trading hours or of the necessity of being in the office at those times. In light of this evidence, the Court accordingly finds that Plaintiff failed to establish that he was otherwise qualified for his position at

RCG. Plaintiff has thus failed to prove a prima facie case of discrimination.

### B. Legitimate, Non-discriminatory Reason

If a plaintiff establishes the elements of a prima facie case of disability discrimination, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. Kocsis, 97 F.3d at 883. As set forth above, Plaintiff has failed to establish a prima facie case of discrimination. Even if Plaintiff had satisfied this burden, however, Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. The evidence at trial showed that Downs had several significant concerns about Plaintiff's job performance at RCG that significantly worsened during the months leading up to Plaintiff's termination.

In addition to her concerns about Plaintiff's absenteeism in the office, described above, Downs testified that in the months leading up to Plaintiff's termination she became increasingly concerned about the large losses Plaintiff had incurred in his personal trading account. RCG's risk management department brought several uncovered margin calls in Plaintiff's personal account to Downs' attention, and she had to ask Kitchen to speak with Plaintiff about them. Downs was worried about the losses in Plaintiff's personal account because RCG was ultimately

14

responsible for them and because Plaintiff was earning so few commissions in comparison.

Downs was also concerned about Plaintiff's ability to manage his clients' accounts. She testified that she had to speak to Plaintiff in the fall of 2000 regarding a large deficit in one of his accounts. Also, in the late spring of 2001, Downs learned that Jon Porter—one of Plaintiff's clients—had attempted to cover a deficit in his account with a third-party check that later turned out to have been stolen. She grew increasingly concerned when Porter failed to pay the money he owed when his promissory note on the deficit came due on July 16, 2001.

The Court found Downs' testimony regarding Plaintiff's work performance deficiencies to be credible and well-supported by the other evidence at trial. In light of her testimony, the Court concludes that even if Plaintiff had proved his prima facie case of discrimination, RCG has satisfied its burden to establish a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Furthermore, having considered all of the evidence in the record, the Court also finds that Plaintiff failed to prove that the reasons for his termination, as articulated by Downs, Kitchen, and the other witnesses at trial, were pretextual.

### C.   Breach of Contract

As Plaintiff has failed to show by a preponderance of the evidence that he was discriminated against in violation of the

ADA, the Court concludes that Plaintiff has also failed to prove that he was terminated without cause. The Branch Office Agreement provides that no notice period is required if "RCG terminates its relationship with Broker(s) for cause[.]" (Ex. 37.) The Court thus finds that Plaintiff has failed to prove his claim of breach of contract.

## III. CONCLUSION

For all of the foregoing reasons, the Court finds that Plaintiff has failed to prove his claims of discrimination under the ADA and breach of contract. Judgment is accordingly ENTERED in favor of Defendant on those claims.[3]

---

[3] At the close of Plaintiff's case, Defendant moved for judgment as a matter of law on all of Plaintiff's claims. The Court denied Defendant's motion as to Plaintiff's claim of discrimination under the ADA and for breach of contract. The Court granted the motion as to Plaintiff's claim of tortious interference with a business relationship against Downs and Kitchen in their individual capacities. The Court ruled that Plaintiff had failed to show by a preponderance of the evidence that he had either an existing or a prospective business relationship with Rosenthal Collins Securities ("RCS"), an equities securities trading company whose ownership structure has some overlap with RCG.

Liability for intentional interference with business relationships requires: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002). The Court determined that Plaintiff had not proven the first element of the Trau-Med standard—the existence of either an existing or prospective business relationship with RCS.

The evidence demonstrated that RCS and Plaintiff had discussed entering into a relationship wherein Plaintiff and Jon Porter would trade securities at RCS, but there was no evidence to show that this deal was ever consummated. While RCS had completed limited due diligence on Plaintiff, there was no evidence that Plaintiff had

So ORDERED this 22 day of December, 2005.

                                        /s/ Jon P. McCalla
                                        JON P. McCALLA
                                        UNITED STATES DISTRICT JUDGE

---

opened any accounts or completed any trades at RCS. Moreover, the entire arrangement was contingent upon Jon Porter's participation and the use of Porter's accounts at First Union, which were never transferred to RCS. There was no evidence that RCS had performed due diligence on Porter, other than a background check (Ex. 29), or that Porter had signed any agreements with RCS.
     In sum, the Court found that there was nothing in the record to show that either Maureen Downs or Douglas Kitchen had interfered with Plaintiff's "business relationship" with RCS, and the Court granted their motion for a judgment as a matter of law on this claim. As this was the only claim against Downs and Kitchen, they were therefore dismissed as defendants at the conclusion of Plaintiff's proof.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 117 in case 2:03-CV-02360 was distributed by fax, mail, or direct printing on December 27, 2005 to the parties listed.

---

Carolyn Howard
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Melissa Kimberly Hodges
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Thomas L. Henderson
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Jeffery Atchley
NORWOOD HOWARD & ATCHLEY
1407 Union Ave.
Ste. 807
Memphis, TN 38104--362

Honorable Jon McCalla
US DISTRICT COURT